U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

NOV - 6 2007

CLERK, U.S. DISTRICT COURT
By _____
                    Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

IN RE:                          §
                                §
DISCIPLINARY PROCEEDINGS        §    NO. 4:07-MC-020-A
AGAINST BRYAN K. BUCHANAN       §
AND TIM S. GILPIN               §

MEMORANDUM OPINION
and
ORDER IMPOSING DISCIPLINE

After having considered the evidence received by the court

in connection with the above-captioned disciplinary proceedings,

argument by or on behalf of the subject attorneys, Bryan K.

Buchanan ("Buchanan") and Tim S. Gilpin ("Gilpin"), and pertinent

legal authorities, the court finds from clear and convincing

evidence that Buchanan and Gilpin each has engaged in conduct

unbecoming a member of the bar of this court and unethical

behavior.[1]  Therefore, the court has concluded that each of them

should be disciplined, as provided in this order.

I.

Background

The court adopts by reference the text under the heading

"Background" on pages 1-8 of the order the court signed in the

---

[1]The records of the court show that Buchanan was admitted to the
bar of this court in June 1980 and that Gilpin was admitted to the bar
of this court in July 2005.

above-captioned case on May 3, 2007, ("May 3 Order") as a
recitation of pertinent events occurring prior to May 3 that led
to these disciplinary proceedings.  Starting with May 3, the
following additional activity relevant to the proceedings has
occurred:

By the May 3 Order the court (1) directed Buchanan and
Gilpin each to file by 2:00 p.m. on May 18, 2007, a document
showing cause, if any there is, why disciplinary action should
not be taken against them on the basis of their conduct as
mentioned in the order, and (2) scheduled a hearing for 2:00 p.m.
on May 25, 2007, on the possibility of the taking by the court of
disciplinary action against the attorneys and the nature of the
action, if any, to be taken.

On May 17, 2007, Buchanan filed a document titled "Motion to
Dismiss and Response to Order to Show Cause."  Buchanan disclosed
that he and Gilpin had testified falsely at the hearing held in
three sessions in March and April 2007 ("March 15 and 20/April 4
hearing") when they told the court that the total fee paid to
them for the representation of Rockey Morante ("Morante") was
$15,000 cash.  Buchanan said in the May 17 filing that the cash
fee payment was $25,000.  Because of the disclosure that false
testimony had been given at the March 15 and 20/April 4 hearing,

the court, as authorized by a local rule, appointed Lars Berg ("Berg"), a member of the bar of this court, to assist the court in the handling of these disciplinary proceedings.

On May 21 Gilpin, through an attorney, filed a response to the show-cause feature of the May 3 Order. Gilpin gave his version of events that occurred at the October 16, 2006, meeting when he and Buchanan were hired to represent Morante and of his contacts with Morante during the time he was representing him. He set out verbatim in his response testimony he had given at the March 15 and 20/April 4 hearing, including his testimony indicating that the fee payment he and Buchanan received for representation of Morante was $15,000, but he failed to disclose that the earlier testimony about the amount of the fee payment was false.

The hearing that was scheduled by the May 3 Order to be held on May 25, 2007, was conducted in two sessions, first the afternoon of May 25 and then the morning and early afternoon of May 29 ("May 25/29 hearing"). Buchanan represented himself, Gilpin was present and was represented by his attorney, Greg Westfall, and Berg appeared pursuant to court appointment. Eight witnesses testified, and a number of exhibits were received.

The motion to dismiss Buchanan had filed May 17 was denied by an order signed May 29. On June 8, after the transcripts of the May 25/29 hearing had been filed, the court signed an order fixing a deadline of June 18, 2007, for Buchanan and Gilpin to make any written submission they wished to make on the subjects of whether disciplinary action should be taken against one or both of them and, if action were to be taken, the nature of appropriate disciplinary action. Neither attorney made a submission in response to the order.

On June 26 Buchanan gave notice of appeal from the ruling denying his motion to dismiss. The court withheld the taking of further action in these disciplinary proceedings pending the outcome of that appeal. On September 10 the United States Court of Appeals for the Fifth Circuit issued an order dismissing the appeal because of Buchanan's failure to timely file a brief and record excerpts.

II.

Additional Concerns the Court Has
About the Conduct of Buchanan and Gilpin
Based on Information the Court Obtained
After the Events Described in the May 3 Order

On pages 30-39 of the May 3 Order the court enumerated the concerns it then had about the conduct of Buchanan and Gilpin

that could form the basis for disciplinary action against one or both of them. In an order signed May 17, 2007, the court added the court's concern over the false testimony given by Buchanan and Gilpin about the October 16 fee payment. As the evidence was received during the May 25/29 hearing, the court developed the following additional concerns relative to the conduct of the attorneys:

(1) In mid-May 2007 Gilpin destroyed a ledger card that constituted evidence relevant to the issues that are before the court in these disciplinary proceedings at a time when he knew that the card was relevant to, and that it should have been preserved for use in, these proceedings.

(2) In early April 2007 Buchanan destroyed a case file folder that he knew had relevance to these disciplinary proceedings, and that should have been preserved as possible evidence for the proceedings.

(3) The court heard confirmation that Buchanan and Gilpin gave false testimony at the March 15 and 20/April 4 hearing concerning the amount of the cash fee they received to represent Morante and the amount each of them received as his share of the total payment.

(4)   Neither attorney complied with the statutory requirements that a Form 8300 report be filed with the government by anyone who, in the course of his trade or business, receives more than $10,000 in cash in one transaction.

(5)   Neither Buchanan nor Gilpin had any communication with Morante's original attorney about Morante's criminal case before or after they took over Morante's legal representation.

These additional concerns were called to the attention of the attorneys during the May 25/29 hearing.  The attorneys were provided an opportunity to address the concerns at the hearing, Tr. of May 25 session at 128-30; Tr. of May 29 session at 109-11, and again after the record of the hearing had been prepared, Order of June 8, 2007.

III.

## Evidence Developed at the May 25/29 Hearing

Testimony was taken at the May 25/29 hearing from Perry Moore ("Moore"), an agent of the government who was involved in the investigation and prosecution of Morante; Buchanan; Gilpin; Danny Burns ("Burns"), the attorney who replaced Buchanan and Gilpin in the representation of Morante in his criminal action;

6

John Bradford ("Bradford"), an assistant United States attorney who participated in the prosecution of Morante; Linda Zuniga ("Zuniga"), an employee in the Fort Worth office of Buchanan and Gilpin; Alfonso Morante, Morante's father; and Debbie Buchanan, Buchanan's wife, who serves as an employee in Buchanan's Denton, Texas, office. The following highlights the May 25/29 testimony that is relevant to this sanctions order:[2]

A.   Witness Moore.

Moore conducted an interview of Morante on March 20, 2007, at the behest of Burns. He also had knowledge of an interview conducted of Morante by another law enforcement official following Morante's arrest, as well as information about an interview conducted of Morante's co-defendant Cortez on December 6, 2006.

When Cortez was interviewed, he identified Fernando Martinez ("Martinez") as a person involved in the drug activity that Morante's criminal case arose from. But, when Morante was interviewed following his arrest he did not mention Martinez. The information Morante gave at that time proved to be false.

---

[2]In those instances where a witness gave inconsistent answers, the court has used in the summary what the court considered to be the most accurate reflection of the witness's testimony.

During Morante's March 20 interview he identified Martinez as the supplier of the methamphetamine that was involved in the transaction that led to the criminal action against Morante.

B.    Witness Buchanan.

Buchanan received a telephone call from Martinez, perhaps as many as thirty days before October 16, 2006, informing Buchanan that Martinez had a friend who was in jail, having been arrested on a federal drug charge, who wanted representation.  During the conversation, Buchanan and Martinez visited about a common friend and persons Buchanan had represented in the past.

Arrangements were made for Martinez to come to the Fort Worth office of Buchanan and Gilpin on October 16 with Morante's family.  Buchanan gave his recollection of the persons present at the meeting.  It differed drastically from the testimony others gave on that subject.  Buchanan said that he still does not recall Martinez being present at the meeting.   Based on what he now has been told, he acknowledges that those present, other than the attorneys, were Morante's mother and father, Martinez, and a second woman.

During the course of the October 16 meeting he and Gilpin were hired to represent Morante.  He had discussed with Martinez, when they visited by telephone in advance of the meeting, the

amount of the fee to be paid. When he talked to Martinez by telephone he assumed that Martinez was a drug dealer with a lot of money because he could pay a big fee. He told Martinez over the telephone to tell Morante's parents that the fee would be $15,000. He cannot remember any other occasion when his Fort Worth office received a cash payment of $10,000 or more. The largest payment received by his Fort Worth office in 2006 was the $25,000 payment received on October 16. The next largest payment received that year was $5,000. He cannot recall having received a fee larger than $15,000 in any office.

He identified a receipt out of the Fort Worth office's receipt book showing that on October 16, 2006, a $25,000 cash payment was made by "Ofilia Gomez" for the legal representation that was to be provided to Morante. The receipt book has been kept in the reception area in the Fort Worth office in the secretary's desk drawer. He said he assumed that Ofilia Gomez is Morante's mother, but he does not know. Then he said that he assumes that Ofilia Gomez was a fictitious name put on the receipt; and, his best guess now is that the person who used that name is Ofilia Martinez.

Buchanan said that there would not be a record of the $25,000 payment other than the receipt given to the person who

made the payment. He never saw a ledger completed for Morante's case.

Buchanan related in detail his observations on October 16 of the woman at the meeting who had a large purse in her lap full of money and the actions taken by her in removing money from the purse and going to the secretary, at his direction, so that the secretary could count and receive the money. He repeats that his memory is that the cash payment was only $15,000. There was discussion at the meeting that another $10,000 fee would be paid if criminal charges were brought against Morante because of the death of his co-offender Davila at the time of Morante's arrest. The fee payment was divided fifty/fifty between him and Gilpin.

He did not obtain enough information to complete a Form 8300 when the cash payment was received on October 16. Nor did he complete and submit a Form 8300 within the fifteen-day period that is required--he still has not completed and submitted such a form. He is in the process of trying to obtain the information needed to fill out a Form 8300 so he can get it to his CPA.

He recognizes the importance to a criminal defendant of cooperating with the government as soon as possible. He never told Morante that he might benefit from identifying Martinez as a drug dealer, explaining that he did not do so because he did not

know that Martinez was involved.  He answered on this subject as

follows:

> Q.   If you assumed that Fernando Martinez was a drug
> dealer with enough money to pay a big fee, why didn't
> you tell Rockey Morante that he might benefit from
> identifying Fernando Martinez as such a drug dealer?
>
> A.   The guy's name was never mentioned by him.  I just
> didn't, okay?  I don't know how to explain it to you
> other than I just did not.  Not that I was trying to
> hide it.  It's just something that didn't cross my mind
> about that, okay?  I guess I was focused on the other
> people involved in the case and I lost focus of, well,
> there may be people out here, you know, that are not
> involved in this case that he may know that he could
> turn in.  See, I think -- Is that what you're getting
> at?

Tr. of May 25 session at 63.  He said he never asked Morante if

he knew where the drugs he was arrested with came from.  He does

not know why he did not.

At one time he maintained a case file on Morante's case in a

file folder.  Most of the contents of that file folder were later

transferred to a three-ring binder.  There were items in the

original file folder that were not transferred to the binder.  He

threw the file folder away after he transferred items to the

binder.  That occurred right after the conclusion of the March 15

and 20/April 4 hearing.

C.   <u>Witness Gilpin</u>.

Gilpin first heard Martinez's name in early October 2006 when he received a call at the Fort Worth office from Buchanan, who was in the Denton office, telling him that "[a] Mexican guy named Fernando, one of Tim Banner or Danner's old clients, had called and had a federal case and they were making an appointment."  Tr. of May 25 session at 91.  He understood from what Buchanan told him that they were coming to the Fort Worth office.  His secretary's calendar for October 9, 2006, and again for October 16, 2006, shows the name "Fernando Martinez" and a telephone number at the 4:30 p.m. time slot, with an abbreviation "B" to indicate that the appointment is for Buchanan.  He cannot explain why the same entry appears on two different dates.

He first met Martinez shortly after 5:00 p.m. on October 16, 2006, in the conference room in the Fort Worth office.  Those present were him, Buchanan, Martinez, a woman who never identified herself, and Morante's father and mother.  He made no effort to find out who the unidentified woman was while they were there on October 16, even though they were discussing Morante's case in her presence.

He was called into the room by Buchanan after Buchanan had been meeting with the others for a period of time.  The main

12

topic of conversation when he entered the room was a concern that Morante might be charged by the Grand Prairie police department for the death of Morante's deceased co-offender, Davila. He was in the meeting ten to twelve minutes. When the decision was made to hire Buchanan and him, the unidentified woman got up and left the room. He knew why she was leaving the room because he saw that she had money in her purse--a lot of money, in bundles. His understanding now, after seeing the receipt and the ledger, is that the fee payment she made was $25,000 cash, with another $10,000 to be paid if a murder charge was filed against Morante. He believes that Morante's family played a role in hiring them, but he does not know whose money was used to pay the fee.

When asked how much cash was received on October 16 for the representation of Morante, Gilpin said, "I'm not going to doubt the receipt of 25,000." Id. at 100. The most he has ever received as a fee as a lawyer in any other case was somewhere between $3,000 to $5,000.

A ledger card, such as the one marked Exhibit 10, was prepared in Morante's case. He looked at it recently. After he did, he threw it away. The information on the card included Morante's name, the fact that $25,000 was paid, and the date of the payment. Also, there was a notation. He is not sure exactly

what the notation said, but it had to do with payment of another $10,000 if Morante were to be charged with murder.

He described the circumstances of his destruction of the ledger card as follows:

Q.   Why did you throw the original ledger card away?

A.   Out of anger.  I just wadded it up.

Q.   Describe the circumstances.

A.   Mr. Buchanan had advised me about the receipt that he discovered.  I came into the office, asked Linda about it, and she said here's -- you know, I think she had already made a copy of the ledger -- or the receipt and she showed me the ledger card.  I knew it was different than what I originally believed, so I wadded it up and I don't remember if I threw it on the floor or threw it in the trash can or what.  But I couldn't find it once you asked for it.

Tr. of May 25 session at 98.  He further explained:

        THE COURT:  When did that occur that you
    threw it away?

        THE WITNESS:  This was like when Mr. Buchanan
    filed a copy with the receipt.

        THE COURT:  Last week?

        THE WITNESS:  Or the -- yes, sir, I think so.

        THE COURT:  Either last week or the week
    before?

        THE WITNESS:  Yes, sir.

        THE COURT:  Well, didn't you think that was
    kind of important, a ledger card?

THE WITNESS: Well, yes, sir, I do now. I knew the receipt reflected -- Mr. Buchanan put the receipt in of the 25,000, and I knew that was a record and it just angered me that the ledger card showed, you know, that I was wrong, that I testified wrong.

Id. at 98-99.

He believes it was on May 17, 2007, when he learned that Buchanan had found the receipt showing that the fee payment was $25,000. It was the following day when he saw, and disposed of, the ledger card.

He knew at the time of the March 15 and 20/April 4 hearing that the amount of the fee payment was an issue. When asked why he did not go back to check the record to see what the payment was, he responded that he should have. He acknowledges that neither he nor Buchanan told the court that $15,000 was not enough when they were ordered by the court to pay into the registry of the court what they had received as a fee.

Sometime after the meeting concluded on October 16, and after the secretary left, he and Buchanan retrieved the $25,000, which was bundled up with rubber bands in either $1,000 or $2,000 bundles, and divided it up between the two of them. He has no record of his receipt of a $12,500 share of the $25,000 fee payment. He put some of it in a bank, spent some of it, and put some in a safety deposit box. He has never completed a Form 8300

for the $12,500 cash he received. Nor has he ever completed such a form. He said he first learned that a Form 8300 exists recently when someone asked him about the form. No one in the office suggested to him that he needed to file that form, and he did not know he needed to file it. During his nineteen years as a law enforcement officer, three of which were devoted to work with the Drug Enforcement Administration, he never became aware that a person had an obligation to make a report to the government if the person receives a cash payment of over $10,000.

When he first met with Morante in jail after being employed, he explained to Morante his options--either plead guilty or go to trial. He does not remember explaining to Morante the possible benefits of cooperating with the government and identifying those involved in the crime. He did not tell Morante that Martinez hired him and Buchanan, nor did he tell Morante anything about the circumstances leading to their employment. He never discussed Martinez with Morante because there never was, in his mind, a reason to do so. He never heard Buchanan discuss Martinez with Morante. The second time he visited with Morante he told Morante that he could benefit by pleading guilty and cooperating and telling the government everything he knows.

The day after the October 16 meeting he again had contact with Martinez, who showed up without an appointment at the Fort Worth office with the sister of deceased co-offender, Davila. They asked him for a reference to a personal injury lawyer, in response to which he made a couple of phone calls, and finally got hold of someone who agreed to see them. Since October 17 he has not had contact with Martinez in person or by telephone. He has no idea why Martinez might have been interested in helping the Davila family get a lawyer. At that point in time he knew that Martinez was connected with two people involved in the drug transaction in question, Morante and Davila.

He summed up what he did on Morante's case as follows:

Q. What all did you do on Mr. Morante's case?

A. I went and met with him two, three -- I mean, total probably about four times. Developed the notes, explained to Rockey several times about pleading and how the guidelines, how the judge wasn't held to the guidelines. Met with him getting ready for trial, but -- and going over everything. That's pretty much it.

Q. Did you go to the arraignment with him?

A. Yes, sir.

Q. Did you go to his rearraignment?

A. Yes, sir.

Q. After the rearraignment, did you actually sit through the PSI interview with him?

A.    Yes, sir.

Q.    After the PSI interview, did you do anything else on the case?

A.    No, sir.

Tr. of May 25 session at 118-19.

D.    <u>Witness Burns</u>.

Burns has been practicing as a criminal defense lawyer in Fort Worth for twenty-nine years. His experience is that it is common for a lawyer taking over a case to talk to the previous lawyer. The successor lawyer needs to find out what the previous lawyer has by way of discovery, what information he has, and what pitfalls the defendant may be facing.

When, after Burns assumed representation of Morante, Buchanan gave him the three-ring binder pertaining to Morante's case he also received a file folder from Buchanan. As he was about to flip through the file folder, Buchanan took it back, saying that everything Burns needed was in the binder. The file folder was a manila folder. There were probably eight or ten pages and pictures in the file folder. He did not inspect everything that was in the file folder that Buchanan took back. He understood that the file folder was part of the file pertaining to Morante.

If Buchanan and Gilpin had discussed the case with Chris Curtis ("Curtis"), the lawyer they replaced when they assumed representation of Morante, they would have learned that Morante had made overtures to the government about cooperating. That fact was disclosed in the file Curtis had on Morante's case.

E.    <u>Witness Bradford</u>.

He is the assistant United States attorney who assumed responsibility for the prosecution of Morante's criminal case from another assistant in late January 2007. Moore informed him, after Bradford became aware of Morante's March 4, 2006, letter to the court complaining of Buchanan, that no one had contacted Moore concerning possible cooperation with the government by Morante.

F.    <u>Witness Zuniga</u>.

Zuniga is the employee in the Fort Worth office of Buchanan and Gilpin to whom they referred in their testimony as the secretary. She has been employed in the Fort Worth office of the attorneys for about one-and-a-half years.

She first heard Martinez's name when Martinez called the office asking to talk to Buchanan about a case. Buchanan was out, and she took a message for Buchanan to return Martinez's call. She informed Buchanan of the call, and Buchanan told her

to have Martinez call him in Denton, and she complied. Thereafter she was told to set up an appointment, and she did so by a telephone communication with Martinez.

She recalls four people showing up for the meeting the afternoon of October 16, 2006, an older man and woman and a younger man and woman. Martinez identified himself, but did not introduce the others. When the group arrived she gave them an information sheet to fill out, and after it was filled out she gave it to Buchanan and informed him that they were there. She does not know which person in the Martinez group filled out the sheet. The sheet has a place to put the name of the person who is in trouble, the address and phone numbers for the contact person, and a place for the identity of the person who filled it out.

When the information sheet was completed,[3] the Martinez group went into the conference room with Buchanan, and the door was shut. Thereafter the door opened and the younger of the two women in the group came to her desk and said that she was going

---

[3]After the information sheet is completed, Zuniga gives it to the responsible lawyer, and then the lawyer returns the sheet to her with instructions to open a file if the lawyers are hired. When she opens a file on the case, she puts the information sheet inside the file folder.

to pay. That woman was in her early to mid-thirties. Zuniga asked how much she was going to pay, and the woman responded that she was going to pay $25,000. The woman then took the money out of her purse in bundles, and Zuniga took the rubber bands off of the bundles and counted the money. There were twenties, fifties, and one hundreds, but more twenties than any other denomination. She then gave the woman the receipt showing that the payment was made by Ofilia Gomez. She used that name on the receipt because the woman told her that was her name. That $25,000 payment was the most she ever received while working in the law office. After she counted the money, she bundled it back up and put it in a big envelope with a ledger card and then put the envelope at a location where she normally would put cash received in the office.

Exhibit 10 is a blank of the kind of ledger card she put in the envelope. After she put the money away, she asked if she could go home and then left for the day. She does not know how long the meeting lasted, but she knows it ended late because it was dark when she left. She never saw Martinez after that day.

She knows that before the morning of October 17 the $25,000 had been removed from the envelope into which she put it because the empty envelope was on her desk when she arrived that morning,

along with the ledger card, the information sheet, and instructions to open a file.

She made up a file for Morante's case the morning of October 17, using a manila file folder. The instructions on her desk to open a file included information about the person who was to be contacted about the case. She put that information inside the file folder under a clip. Once the file folder was completed, she put it in alphabetical order in file drawers in the office used by Buchanan and Gilpin. She files most of the papers in the file folders. She assumes Morante's file folder had in it all the information about his case. They do not have a file destruction system. All files that have been created since she has been with the law firm are still in the law office or are in storage. Sometime earlier in the month of May 2007, Buchanan asked her to look for Morante's file folder. He explained to her that he needed the file. She looked for the Morante file folder an entire day, and gave up when she could not find it. Buchanan never told her that he had thrown it away.

Her occasion for recently looking up the receipt that showed the $25,000 payment was that Buchanan called her around May 15, 2007, and asked her to look for a receipt for Ofilia Gomez for the date of October 16. When she found the receipt, Buchanan

asked her the dollar amount it showed, and she told him. She had

not discussed Ofilia Gomez with Buchanan before he called and

asked about the receipt. Before Buchanan asked her for the

receipt in mid-May, nobody had come to her to try to find out how

much the fee payment was.

She put and kept the ledger card she completed on the

Morante case in the side drawer in her office. She is the one

from whom Gilpin got the ledger card about which he testified

earlier. She was not there when Gilpin destroyed the card. The

subject of the ledger card came up during a discussion she had

with Gilpin about having given Buchanan a receipt showing the

$25,000 cash payment. When she showed Gilpin the ledger card, he

took it from her. He went to his office and said that he was

going to fax it to Denton. That was the last she saw of it.

That happened right after she provided Buchanan a copy of the

receipt.

No one had asked her about the ledger card before Gilpin

took it. She doubts that the lawyers knew that she had one. The

ledger card showed the name of the client, that the fee was to be

$25,000, and that another $10,000 was to be paid. It also

contained contact information, which would have been based on the

information sheet that was filled out on October 16. She recalls

that she had put the name "Ofilia Gomez" in the top right corner of the ledger card, along with an address and phone number.

The first knowledge she had that the ledger card had been destroyed was when she overheard Gilpin say the morning of May 25, 2007, before they came to the courthouse, that he had destroyed it. She had been looking for it throughout the preceding week because Gilpin's attorney had asked her for the ledger card.

G. Witness Alfonso Morante.

Alfonso Morante is Morante's father. He and his wife were present at the meeting in the offices of Buchanan and Gilpin on October 16, 2006. Those present, other than the lawyers, were Mr. and Mrs. Morante, Martinez, and Martinez's wife. Martinez told him that the woman with Martinez was his wife. He did not see Martinez's wife pay any money, but he saw her leave the room. She did not take money out of her purse before she left the room.

H. Witness Rockey Morante.

Morante identified his signature on the motion to substitute that was filed in his criminal action on October 18, 2006, and which shows that it was signed on October 17. Gilpin presented the motion to him for his signature when he was at the Mansfield jail. No one else was present. At that time Gilpin just told